IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 31, 2021 Session

## STATE OF TENNESSEE v. STEPHEN MAURICE MOBLEY

**Appeal from the Criminal Court for Hamilton County**
**No. 301720   Barry A. Steelman, Judge**

_____

### No. E2020-00234-CCA-R3-CD
_____

Following a jury trial, the Defendant, Stephen Maurice Mobley, was convicted of two counts of first degree premeditated murder and one count each of attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony.  The trial court merged the attempted first degree murder and aggravated assault convictions and imposed an effective sentence of life imprisonment plus twenty-six years.  On appeal, the Defendant contends that (1) the evidence is insufficient to support the convictions; (2) the trial court improperly denied the Defendant's challenge to the State's striking a prospective juror as violating *Batson v. Kentucky*, 476 U.S. 79 (1986); (3) a juror failed to disclose her prior knowledge of the Defendant during voir dire and provided extraneous information to other jurors in violation of the Defendant's right to a fair trial; (4) the trial court erred in admitting hearsay statements under the excited utterance hearsay exception; and (5) the trial court improperly admitted evidence that the Defendant had been placed on a most wanted list by law enforcement prior to his arrest.  We remand the case to the trial court for a hearing as to whether the State struck a potential juror in violation of *Batson*.  We conclude that none of the other issues raised by the Defendant warrant relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

M. Todd Ridley, Assistant Public Defender – Appellate Division (on appeal); and Steven E. Smith, District Public Defender; Mike Little, Executive Assistant District Public Defender; and Steven Brown and Eliza E. Williams, Assistant District Public Defenders (at trial), for the appellant, Stephen Maurice Mobley.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; M. Neal Pinkston, District Attorney General; Cameron Williams, Executive Assistant District Attorney General; and Kevin Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence presented at trial established that the Defendant shot the victims, Ms. Jasmine Hines, Mr. Rashaud Taylor, and Ms. Zirrshaddia Scott, multiple times during a party at a home in Chattanooga, Tennessee, during the early morning hours of September 5, 2016. Ms. Hines and Mr. Taylor died as a result of their injuries, and Ms. Scott was seriously injured. The Defendant fled the scene and turned himself in to the police a few days later.

### The State's Proof

Ms. Scott testified that she was close friends with Ms. Hines, Mr. Taylor, and Mr. David Reed and that they often gathered at Mr. David Reed's home. On Saturday, September 3, 2016, Ms. Scott went with Ms. Hines to Mr. David Reed's home, where they also saw Mr. Taylor and the Defendant. Ms. Scott, Ms. Hines, and Mr. Taylor spent the night at the home, sleeping on the couch in the living room, and then left the next morning. They returned to Mr. David Reed's home on Sunday evening, when Mr. David Reed was having a party and a cookout in celebration of the Labor Day weekend. Approximately twenty people were in attendance, including the Defendant, and Ms. Scott was only acquainted with about one half of the partygoers. Ms. Scott recorded a Facebook Live video of the party and identified Ms. Hines, Mr. Taylor, and Mr. David Reed in the recording. At the time, the Defendant and several others were outside of the home.

Ms. Scott testified that Mr. Taylor brought a bag of Xanax pills to the party and that she, Mr. Taylor, and Ms. Hines took Xanax throughout the night. They also drank alcohol and smoked marijuana. Ms. Scott recalled that at one point, she and Ms. Hines were "breaking down" a bar of Xanax that Mr. Taylor had given them when the Defendant approached them and asked for "a hit." Ms. Scott stated that she "shoved [the Defendant] off" because she did not want to share her drugs with someone whom she did not know. Ms. Hines had a similar reaction. Ms. Scott said the Defendant just walked away.

- 2 -

Once the party began dying down, the group decided to go to Chattanooga Billiards Club ("CBC"). Ms. Hines drove Ms. Scott, Mr. Taylor, and Mr. David Reed in her white Saturn, while the Defendant and others followed in another vehicle. Ms. Scott reviewed video surveillance from the CBC and agreed that the video showed her, Mr. Taylor, Ms. Hines, and Mr. David Reed arriving at 11:43 p.m. The video showed the Defendant, wearing a black shirt and khaki pants, and two other men arriving at 12:02 a.m. Ms. Scott testified that while at CBC, she, Ms. Hines, and Mr. Taylor ordered at least two pitchers of beer and that while they had consumed some alcohol at Mr. David Reed's house, they drank heavily at CBC. They played darts and pool, and Mr. David Reed paid for everything and purchased marijuana for them.

Ms. Scott recalled that the Defendant approached her and Ms. Hines while they were playing pool and asked if he could play with them. Both Ms. Scott and Ms. Hines refused, stating that they were playing. Ms. Scott stated that the Defendant "kind of shrugged off with a little bit more attitude now."

Ms. Scott testified to seeing the Defendant with a handgun throughout the night. She described the gun as a "baby nine" or a nine-millimeter handgun with "a little attachment under the barrel." She said the Defendant initially had the gun in his pocket. He pulled out the gun before they went to CBC and after Mr. David Reed turned off the lights in the living room while the Defendant was sitting alone on the floor. While clutching the gun, the Defendant asked what was occurring and went to a window. When Mr. David Reed turned on the lights, the Defendant returned to sitting on the floor with the handgun beside him.

Ms. Scott testified that she became more intoxicated and that while she did not recall leaving CBC, she recalled the ride back to Mr. David Reed's house. Ms. Hines drove Ms. Scott, Mr. David Reed, and Mr. Taylor to Mr. David Reed's house. The Defendant arrived sometime later.

Ms. Scott testified that upon returning to Mr. David Reed's house, she drank a hot beer and went to the bathroom where she vomited in the sink, making a mess. She looked in the bathroom mirror and saw the Defendant behind her. Ms. Scott went into a room where everyone else had gathered. She said that the Defendant was angry and followed her while yelling that everyone needed to leave and that someone needed to clean up the bathroom. Rather than leaving, Ms. Scott acknowledged that she and Ms. Hines began arguing aggressively with the Defendant, but Ms. Scott could not recall what was said. She stated that everyone, including Mr. David Scott and Mr. Taylor, "had a say-so." She also stated, "I kind of really don't remember it. I remember us arguing and stuff, but I don't really remember the whole extent of it."

Ms. Scott testified that she needed to rest and that because the house was dirty, she decided to rest in a chair. She did not recall what next occurred, stating that "this is where my memory kind of fades." She agreed that she likely was starting to pass out. She recalled that when she awoke, she heard "a boom," saw blood on herself, and realized that she had been shot. She saw Ms. Hines and Mr. Taylor lying on the floor and covered in blood. She called their names, but they did not respond. Ms. Scott used her cell phone, which was lying on the floor near her, to call 911. She did not know how much time had elapsed between the argument with the Defendant and the shooting, and she did not know who had shot her. Ms. Scott sustained two gunshot wounds, one to her right arm and the other that entered the top of her thigh and exited on the lower portion of her knee. She remained hospitalized for three days and was using a walker when she testified during the preliminary hearing.

On cross-examination, Ms. Scott agreed that during her Facebook Live recording, Mr. David Reed announced over the video the street on which the party was occurring and that there were 111 views of the video registered. When questioned regarding her testimony at the preliminary hearing that she did not remember anything that occurred once she returned to Mr. David Reed's house after leaving CBC, Ms. Scott testified that she remembered "bit and pieces" of what occurred after they returned to the home, including her vomiting and the argument that followed. She recalled telling an officer that no arguments occurred immediately prior to the shooting but stated on redirect examination that she told the officer about the incidents that occurred after returning to Mr. David Reed's house, including the argument with the Defendant. She stated that while she was sitting in a chair for most of the night, she did not know where she was when she was shot and that she was lying on the floor inside the same room with Ms. Hines and Mr. Taylor when she reached for her cell phone to call 911. Ms. Scott had to undergo surgery on her leg due to the gunshot wound.

Mr. Jeremy Cotton, who lived five or six houses down from Mr. David Reed, also attended the cookout and party in September 2016. He testified that prior to midnight, he drove the Defendant and a few other people to CBC where they met the victims and Mr. David Reed. Mr. Cotton recalled that at some point while at CBC, Mr. Taylor pointed to the watch that the Defendant was wearing and asked, "Is that my watch?" The Defendant removed the watch from his wrist and gave it to Mr. Taylor. After leaving CBC, they returned to Mr. David Reed's house where people relaxed, talked, and played chess. Mr. Cotton stated that the Defendant displayed "[m]ixed emotions," and Mr. Cotton believed that at one point, the Defendant was upset.

Mr. Cotton recalled Ms. Scott vomiting in the bathroom and testified that while the Defendant was in another room, Mr. Cotton went into the bathroom and saw Ms. Scott lying on the floor. The Defendant announced that Ms. Scott had vomited and that

he was not going to clean it. Mr. Cotton did not recall the Defendant stating that everyone needed to leave. Mr. Cotton denied that the Defendant and Ms. Hines argued. Mr. Cotton acknowledged telling Detective Christopher Blackwell that Ms. Hines and Ms. Scott were "cussing [the Defendant's] a** out," but Mr. Cotton maintained, "It was hearsay what I heard."

Mr. Cotton testified that when he left the party to drive one of his friends home, Mr. David Reed, Ms. Hines, Ms. Scott, and Mr. Taylor were still there. Mr. Cotton said he was unaware of the Defendant's being at Mr. David Reed's home. Mr. Cotton acknowledged telling Detective Blackwell that the Defendant was still at Mr. David Reed's home when Mr. Cotton left but testified, "It wasn't definite, because when I said he left, before I left, he left." Mr. Cotton also testified that he did not know whether the Defendant left because Mr. Cotton was playing chess and was not paying attention.

Mr. Cotton testified that he returned to his home at approximately 4:30 a.m. Mr. David Reed later came to Mr. Cotton's home crying, "in a panic," and stating, "He did it, he did it." Mr. Cotton asked, "Did what?" Mr. David Reed replied, "He killed them, he killed them." Mr. Cotton stated that Mr. David Reed never clarified who "he" was. Mr. Cotton testified that while speaking to Mr. David Reed, Mr. Cotton saw another person in the street on the opposite side of Mr. David Reed's house. Mr. Cotton acknowledged that he told Detective Blackburn that the person in the street was the Defendant and that as a result, he knew that Mr. David Reed was running from the Defendant. However, Mr. Cotton testified at trial that he did not see the Defendant "personally," that he only saw a "figure," and that the "figure" "possibly" could have been the Defendant. Mr. Cotton also acknowledged telling Detective Blackburn that the Defendant was angry because the female victims would not have sex with him, but Mr. Cotton maintained at trial that he only assumed that this was the reason that the Defendant was upset.

On cross-examination, Mr. Cotton testified that when he left Mr. David Reed's home, he did not see the Defendant and that to Mr. Cotton's knowledge, only Mr. David Reed and the three victims were present. Mr. Cotton acknowledged that he previously had told defense counsel that he did not recall seeing the Defendant in the street on the morning of the shooting and that Mr. Cotton expressed surprise upon learning that he made such a statement to Detective Blackburn. Mr. Cotton acknowledged receiving death threats from members of the victims' families.

Mr. David Reed was a friend of the victims and a cousin of the Defendant, who had been living with Mr. David Reed for one to two months prior to the shooting. On September 4 into the early hours of September 5, 2016, Mr. David Reed had a party at his home in celebration of Labor Day weekend, and the victims and the Defendant attended the party. At some point, everyone went to CBC and then returned to Mr. David Reed's

home. Mr. David Reed fell asleep on the couch in the living room, and Ms. Scott vomited in the bathroom. Mr. David Reed recalled that the Defendant became upset and began arguing with Ms. Hines and Ms. Scott. The Defendant told them to leave, but they refused. Mr. David Reed told the victims, "Let's just go," but the victims did not listen to him. Mr. David Reed retrieved his cell phone and his wallet, left his home, and began walking toward Mr. Cotton's house. Mr. David Reed stated that when he left, the victims and the Defendant were the only people whom he saw inside his home.

Mr. David Reed testified that as he was walking toward Mr. Cotton's house, he heard approximately four gunshots and that he believed people were shooting their guns in celebration of Labor Day. He acknowledged that upon arriving at Mr. Cotton's house, he was crying and told Mr. Cotton that he believed something had happened to the victims because he had heard gunshots. Mr. David Reed denied telling Mr. Cotton, "He did it, he did it, he killed them," or telling him that the Defendant had killed the victims. Mr. David Reed said he saw the Defendant with a semiautomatic gun earlier in the evening, but Mr. David Reed did not know the caliber of the gun.

Mr. David Reed testified that while he was at Mr. Cotton's home, his father, Mr. Dan Reed, called him. After Mr. David Reed told Mr. Dan Reed what had occurred, Mr. Dan Reed came by Mr. Cotton's home and drove Mr. David Reed back to the scene. Mr. David Reed stated that he was arrested and transported to the police station, where Detective Blackwell interviewed him. Mr. Dan Reed was present for a portion of the interview.

Mr. David Reed stated that before he spoke to the detective, the Defendant called him. Mr. Dan Reed grabbed Mr. David Reed's cell phone and spoke to the Defendant, but Mr. David Reed did not hear the conversation. Mr. David Reed acknowledged telling Mr. Dan Reed that he was afraid of the Defendant, but Mr. David Reed did not recall telling him that the Defendant warned against providing any information to the police.

On cross-examination, Mr. David Reed testified that several people attended the party, including people whom he did not know. He agreed that he announced the location of the party on Facebook Live. He stated that sometime on Sunday prior to the shooting, a relative of a former roommate drove by his house in a black Charger and slowed down. Mr. David Reed acknowledged being afraid of those inside the Charger.

Mr. David Reed agreed that on the night of the party, he attempted to have sex with Ms. Hines but that Ms. Hines pushed him away. He denied ever possessing a gun. He identified photographs of himself holding guns but maintained that the firearms were actually BB guns.

Mr. David Reed testified that he was sleeping when Ms. Scott became sick and that he did not know what time she vomited. He recalled telling the detective that he had seen the Defendant with a gun earlier in the night but did not see him with a gun at the time of his argument with Ms. Scott and Ms. Hines. Mr. David Reed stated that when he arrived at Mr. Cotton's house, he told Mr. Cotton that he believed something happened to the victims and that he then "passed out." Mr. David Reed agreed that he did not know what had occurred or whether anything had occurred until his father called him.

On redirect examination, Mr. David Reed testified that he left his home because he believed it would lead to everyone else leaving. He did not recall the Defendant's being angry about anything other than Ms. Scott's vomiting. Mr. David Reed recalled telling Detective Blackwell that the Defendant was upset because the female victims refused to have sex with him. He agreed on recross-examination that he only assumed that the female victims' refusal to have sex with the Defendant was the reason that the Defendant was upset. He acknowledged that he had a prior theft conviction from 2015.

Officer Justin Brumbaugh, a patrol officer with the Chattanooga Police Department ("CPD"), responded to the scene with two other officers. The officers checked the perimeter of the home and went to the front where they heard a female screaming for help from inside the house. One of the officers had to kick in the front door so that they could enter. Officer Brumbaugh testified that when the officer kicked in the door, the door "swung open very easily." He stated, "I don't think it was secured very well, as if maybe the latch might have been catching" onto something. Officer Brumbaugh observed a large amount of blood in the entryway and Ms. Scott lying on the floor in a doorway between two rooms. The officers cleared the home but did not locate any suspects. Officer Brumbaugh observed two deceased victims lying on the floor of the living room. He notified investigators and crime scene officers. According to the crime scene log, Officer Brumbaugh signed in at 6:35 a.m. and left the scene at 9:15 a.m.

Mr. Dan Reed testified that although he was not Mr. David Reed's biological father, he raised him like his own son. Mr. Dan Reed knew the Defendant as Mr. David Reed's cousin and the victims as Mr. David Reed's friends. Mr. Dan Reed lived on the same street as Mr. David Reed and Mr. Cotton, and he awoke on the morning of September 5, 2016, to find the police blocking off the street. Mr. Dan Reed determined that the officers were at Mr. David Reed's home, began searching for Mr. David Reed, and located him at Mr. Cotton's home. After speaking to Mr. David Reed about the events, he drove Mr. David Reed back to his home to meet with officers. Officers placed Mr. David Reed and Mr. Dan Reed in the back of a patrol car and drove them to the police station, where Mr. David Reed was interviewed. Mr. Dan Reed was present for a portion of the interview and stated that Mr. David Reed was scared and gave the officers information about what he had witnessed.

Mr. Dan Reed testified that while at the police station, he called Ms. Wanda Norris, the Defendant's aunt, because he heard that Ms. Norris had driven the Defendant to another location. Mr. Dan Reed gave his cell phone to an officer to speak to Ms. Norris and learned that she had taken the Defendant to a hotel.

Mr. Dan Reed testified that following the interview, he and Mr. David Reed returned to Mr. Dan Reed's house and that the Defendant called Mr. David Reed while they were standing outside on the porch. Mr. Dan Reed stated that when Mr. David Reed answered the call, he had a "s*** look on his face." Mr. Dan Reed clarified that Mr. David Reed appeared "shaky" and "fearful" and looked as if "he saw a ghost." Mr. Dan Reed asked who was calling, and Mr. David Reed replied, "Dolla," or the Defendant. Mr. Dan Reed took the cell phone from Mr. David Reed and asked the Defendant, "Why the f*** did you kill my people?" The Defendant relied, "Cuz, I didn't do that." Mr. Dan Reed called the Defendant a "liar," and the Defendant hung up. Mr. Dan Reed testified that Mr. David Reed still appeared to be scared and told him that the Defendant asked him what the police had said to him and warned Mr. David Reed not to tell the police anything.

Ms. Wanda Norris, the Defendant's aunt who lived on the same street as Mr. David Reed, testified that during the early morning hours of September 5, 2016, the Defendant came to her house, woke her up, and asked her to drive him to a motel. Ms. Norris stated that she had driven the Defendant to a motel on prior occasions. She drove the Defendant to Motel 6, located about two miles away from her home. She entered the lobby while the Defendant remained in her car, paid for the room using her credit card, and registered the room under her name. The surveillance video of the motel was entered as an exhibit and showed Ms. Norris in the lobby at 6:39 a.m. Ms. Norris did not recall what time she arrived at the motel but did not dispute the time listed on the video. After paying for the room, she returned to her car and gave the Defendant the room key. She returned home while the Defendant remained at the motel.

Ms. Norris testified that later that same day, she was contacted by the police about where she had taken the Defendant. She said that she initially informed the officer that she had driven the Defendant to Econo Lodge, which was located next to Motel 6, but that she contacted the police once she realized her mistake.

On cross-examination, Ms. Norris testified that she often helped the Defendant obtain a motel room. She stated that she always paid for the room and registered for the room under her name and that the Defendant would pay her back. She described the Defendant as acting "normal" when he came to her home on the morning of the shooting, and she did not see the Defendant with a weapon or blood on his clothes. Ms. Norris testified that a few days after the shooting, the Defendant contacted her about turning

himself in to the police. She met the Defendant at an agreed-upon location and drove him to the police station. She stated on redirect examination that the Defendant had called her and that they agreed for her to meet him near a car wash.

CPD Sergeant William Stephen Campbell, Jr., who was sergeant over the criminal intelligence unit and the fugitive unit, testified that on September 5, 2016, he and other officers attempted to locate the Defendant, who had outstanding arrest warrants for two counts of homicide. Sergeant Campbell received information that the Defendant was located at room 229 on the second story of Motel 6. The motel was an "L-shaped," two-story building with railing on both sides of the second story balcony and a "cut-way" that passed between the "L." Officers set up a perimeter around the motel, and Sergeant Campbell and another officer were in an unmarked police vehicle parked behind the building. As the officers were repositioning their vehicle to obtain a better vantage point, the Defendant stepped outside of room 229. The Defendant smoked a cigarette while staring at Sergeant Campbell's vehicle. Sergeant Campbell testified that the tint on his vehicle's windows was not dark and that he was afraid that the interior of the vehicle was visible. After the Defendant finished smoking his cigarette, he walked to his left and around the corner, and Sergeant Campbell lost sight him. Sergeant Campbell notified the police units in the front of the motel, but the officers were still setting up a perimeter and did not see the Defendant. Officers continued to conduct surveillance of the motel but did not see the Defendant anymore that day. When attempts to contact anyone inside the motel room failed, officers obtained a search warrant, and members of the SWAT team executed the warrant. The Defendant was not inside the room.

On cross-examination, Sergeant Campbell testified that he was aware that arrest warrants for the Defendant were secured at around 3:00 p.m. on September 5th and that officers arrived at the motel in the afternoon on that same day. He agreed that he did not see the Defendant run or enter a car while at the motel. The search warrant was executed at 9:00 p.m.

CPD Investigator Tim Pickard with the fugitive unit also assisted in attempting to locate the Defendant and was in an unmarked police unit parked in the front of Motel 6 on September 5th. Investigator Pickard testified that officers arrived at the motel around lunch or early afternoon and that he had been there for approximately thirty minutes when officers parked on the other side of the motel stated over the radio that they had observed the Defendant exit room 229. Investigator Pickard said he watched a stairwell leading to the first floor, believing that the Defendant would walk toward that area, but Investigator Pickard never saw the Defendant. Investigator Pickard recalled a gold vehicle with dark-tinted windows driving from behind the motel and exiting onto the highway around the same period of time. He observed multiple occupants inside the vehicle, but due to the dark tint on the windows, he was only able to determine that the

driver was female. Investigator Pickard testified that officers continued their surveillance of the motel into the evening hours but that they never saw the Defendant again. At approximately 9:00 p.m., SWAT officers executed a search warrant for room 229, but the Defendant was not there.

Investigator Pickard testified that on September 6th, officers requested that the Defendant be placed on the Tennessee Bureau of Investigation's ("TBI") Top Ten Most Wanted List. He stated that in order to have a suspect placed on the list, an officer must contact a TBI agent and advise the agent of a suspect who was wanted for a violent crime that meets the criteria for placement on the list. The officer then would send an email to the agent, listing the suspect's name, any identifying characteristics, the charges, and a summary of the circumstances leading to the charges. The agent would send the information "up the chain of command" to determine whether the request would be granted. Investigator Pickard testified that once a suspect is placed on the list, the TBI disseminates information to media outlets and to state and federal law enforcement agencies regarding the suspect, the identifying characteristics, the charges, the location where the offenses were committed, and a summary of the events that led to the charges in an effort to generate tips to locate the suspect.

Investigator Pickard testified that after the Defendant was placed on the list, the TBI received a tip that the Defendant was at an apartment complex located two to three miles from Motel 6. Officers arrived at the apartment complex on the night of September 6th and remained into the early morning hours of September 7th. However, officers were unable to locate the Defendant or anyone associated with him and were unable to corroborate the tip. The Defendant turned himself in to the police at 5:00 or 6:00 a.m. on September 7th. Investigator Pickard understood that an officer was outside the police station putting gasoline in his vehicle when the Defendant approached him and identified himself.

CPD Sergeant Josh May, who was the head of a group violence intervention program in September of 2016, monitored the Defendant's Facebook page. Sergeant May testified that at around 10:30 or 11:00 p.m. on September 6th, he located a video of the Defendant posted on the Defendant's Facebook page. The video, which was approximately three minutes long, was played for the jury and entered as an exhibit at trial. In the video, the Defendant announced that he wanted to get some information "off [his] chest" before turning himself in to the police. He stated that there were two sides to every story and that people could believe what they wanted to believe. He maintained, "No p***y made me go on a m****r f***ing rampage." He said what would make him go on a "m****r f***ing rampage is a person not respecting who I am." He stated that people should get their "m****r f***ing facts straight" and that he would not go on a "m****r f***ing killing spree over some m****r f***ing p***y." He again mentioned

- 10 -

making the recording "before I turn myself in" and warned people to leave his family alone.

CPD Investigator Gregory Mardis with the crime scene unit received a call at around 6:30 a.m. to respond to the scene of the shooting. After a search warrant for the home was secured, Investigator Mardis entered the home, took photographs, and collected evidence. He observed a puddle of vomit on the ground by the driver's side door of a white Saturn parked in the driveway. He collected a small bag of what appeared to be marijuana and four lottery tickets on a gravel driveway that went along the west side of the house, as well as beer cans on the front porch and throughout the house. He also collected swabs from blood stains on the front porch, the floor inside the home, and the wall behind the front door. In the den where the deceased victims' bodies were recovered, Investigator Mardis collected several cigarette butts and the Defendant's Tennessee identification card. He recovered a cell phone that was plugged into a charger at the threshold of the door leading into the living room. He observed a large amount of vomit around and on top of the sink in the bathroom.

Investigator Mardis testified that he collected a total of ten nine-millimeter shell casings and five projectiles from the crime scene. The shell casings were not all the same brands of ammunition, which Investigator Mardis stated was not uncommon. One of the projectiles traveled through the interior of the house, through the north wall, exited the house, and landed in the "overhang" outside the house. Investigator Mardis initially believed that the projectile was related to the shooting but changed his opinion after speaking with another law enforcement agent. Investigator Mardis collected two projectiles from the home approximately two months after the shooting when the homeowner discovered the projectiles on the floor of the den while pulling up the carpet.

Investigator Mardis testified that he collected a .380-caliber pistol in the doorway of a bedroom located across from the den. The pistol was on the floor and against the wall between a piece of furniture and the door frame. A magazine was in the well of the gun, the hammer was back, and the gun had a heavy coating of dust. Investigator Mardis located a corroded and rusted .380 caliber shell casing in the gravel driveway, which he stated appeared as if it had been at that location for some time. Twelve .22-caliber live rounds were recovered from a dish with some change, and other assorted items were in the bedroom across from the living room. Nine-millimeter rounds were located inside a blue box on top of a dresser inside another bedroom, and a live .223-caliber round was collected from the top of a piano inside the den.

On cross-examination, Investigator Mardis agreed that the condition of the home was "deplorable." He noted that a separate exterior door in the kitchen was locked and boarded, that none of the windows were broken or appeared to have been tampered, and

that the only access into or out of the house was through the front door.  He was aware that when first responders arrived, the front door was locked and that the first responders had to kick in the door in order to enter the house.  He stated that while he dusted the doorknob to the front door for fingerprints, he did not swab the doorknob or examine the locking mechanism on the doorknob.

Crime scene investigators photographed the Defendant and Mr. David Reed and collected buccal swabs from them, as well as their clothing.  An investigator also took swabs of Mr. David Reed's hands to test for gunshot residue.  Special Agent Kyle Osborne, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), analyzed the swabs taken from Mr. David Reed's hands and the Defendant's clothing for gunshot residue and did not find gunshot residue on either the swabs or the Defendant's clothing.  Special Agent Osborne testified that the absence of gunshot primer residue is consistent with an individual either not firing the weapon or not being exposed to a source of gunshot primer residue.  He also testified that a negative result could occur when the gun primer residue particles are lost due to washing, excessive time between the discharge of the firearm and the collection of the items, or "other routine activities."

TBI Special Agent Gregory Fort, a forensic biologist with the DNA unit, analyzed several items collected from Mr. David Reed's home.  He concluded that the Defendant's DNA was on beer cans collected from outside the house, on the front porch, and throughout the interior of the house.  A swab taken from the stain on the front porch was positive for blood and included a DNA profile that was consistent with a mixture of at least two individuals, and the profile of the major contributor matched Ms. Scott.  A stain from the top left shoulder of a white shirt collected from the front porch was positive for blood and included a DNA profile that was consistent with a mixture of at least four individuals, including one unknown male.  A swab taken from the neck and armpit areas of the shirt included a DNA profile that was consistent with a mixture of at least three individuals, and the DNA profile of the minor contributor belonged to the same unknown male.  The same unknown male's DNA was on one of the cigarette butts recovered from the den.  The DNA profiles of two other unknown males were on other cigarette butts recovered from the den.  The DNA profile of a fourth unknown male was on beer cans collected from the kitchen.  Ms. Hines's blood was on another cigarette butt that was collected close to her body in the den, and Mr. Taylor's DNA was on another cigarette butt collected from the den.  Special Agent Fort testified that it was not unusual that multiple DNA profiles were obtained on beer cans and cigarette butts collected from a party attended by numerous people.  Special Agent Fort did not locate any blood on the Defendant's clothing, and he did not receive any buccal swabs from Mr. David Reed or Mr. Cotton.

TBI Special Agent Shelly Betts Carman with the firearm and toolmark identification unit examined and analyzed the fired cartridge casings, projectiles, ammunition, and the firearm collected from the scene. She testified that she examined ten spent nine-millimeter luger cartridge casings and determined that they had all be fired from the same unknown firearm. While Special Agent Carman was unable to determine the manufacturer of the firearm used, she determined that the firearm had a barrel that "tilt[ed] down" when being fired, which is typically a higher quality firearm. She entered two of the fired cartridge casings into a national database and linked them to another shooting that occurred in Chattanooga on February 3, 2016.

Special Agent Carman examined five projectiles recovered from the scene. She determined that four of the projectiles had been fired through the barrel of the same firearm and that they had class characteristics consistent with nine-millimeter ammunition. She could not associate cartridge casings with fired projectiles. The fifth projectile, which was recovered from the outside trim of the house, was fired from an unknown firearm and appeared to be more tarnished or discolored than the other projectiles. Special Agent Carman stated that the projectile showed evidence of rust, which could result when the projectile was wet or exposed to the elements. She also stated that the projectile could have been in the trim for a period of weeks or months. She noted that one of the four projectiles that was fired from the same firearm was covered in blood or tissue and began to tarnish as a result.

Special Agent Carman testified that she examined and test fired a .380-caliber automatic pistol and determined that the cartridge casings and projectiles were not fired from the pistol. She also received two boxes of nine-millimeter Makarov cartridges, twelve .22-caliber LR cartridges, and a .223-caliber Remington cartridge.

On cross-examination, Special Agent Carmen testified that it was possible that the projectile recovered from the trim could have been tarnished prior to being fired and then fired at the same time as the other projectiles recovered from the scene. She said it also was possible that the projectile was fired at a different time. She stated that to determine whether the cartridge casings entered into the database where actually connected from the February 2016 shooting, she would need to examine the cartridge casings collected from the February 2016 shooting.

CPD Detective Christopher Blackwell, the lead detective in the case, testified that the 911 call of the shooting was made at 6:23 a.m., and he arrived at the scene at 7:44 a.m., after Ms. Scott had been transported to the hospital. After a search warrant was completed and executed at Mr. David Reed's home, Detective Blackwell went to the hospital to attempt to speak to Ms. Scott. Detective Blackwell stated that while Ms. Scott was awake, she was in pain and afraid and that he observed injuries on her left leg and

arm. She provided him with information about the shooting. Detective Blackwell was only able to speak to her for about twenty minutes because she was in so much pain and was about the be taken into surgery.

When Detective Blackwell returned to the scene, he learned that Mr. David Reed had arrived. Officers transported Mr. David Reed and Mr. Dan Reed to the police station, where Mr. David Reed agreed to waive his rights and speak to Detective Blackwell. Detective Blackwell testified that Mr. David Reed was cooperative and provided information about the homicides and that Mr. Dan Reed was present for a portion of the interview. Mr. Dan Reed and an officer spoke to Ms. Norris and learned that the Defendant possibly was at Motel 6. Detective Blackwell secured warrants for the Defendant's arrest and notified the fugitive team.

Detective Blackwell secured a search warrant for room 229 of Motel 6 and entered the room after the warrant was executed. He stated that although the Defendant was not inside the room, he observed evidence that someone had been there. A cell phone charger was plugged into an outlet; cigarette butts were in an ashtray; and the bed was unmade and appeared as if someone had sat on it. Detective Blackwell testified that the Defendant turned himself in to the police on September 7th at approximately 6:46 or 7:00 a.m.

Detective Blackwell and another detective returned to the hospital in an attempt to interview Ms. Scott a second time. Ms. Scott was still in critical condition as a result of her leg injury. She identified the Defendant from a photographic lineup as someone who attended the party on the night of the shooting.

Detective Blackwell testified that on the afternoon of September 6th, he and another detective went to Mr. Cotton's house to interview him. Mr. Cotton requested that the interview take place in the detectives' police vehicle. The detectives spoke to Mr. Cotton for twenty-five to thirty minutes and audio recorded the interview. Detective Blackwell stated that Mr. Cotton's demeanor during the interview was "much different" than his demeanor when he testified at trial. Detective Blackwell explained that during the interview, Mr. Cotton was not as scared or emotional and was more forthcoming. Detective Blackwell asked Mr. Cotton whether the Defendant got into an argument with Ms. Hines and Ms. Scott, whether the Defendant became angry or upset because Ms. Hines and Ms. Scott refused to have sex with him, and whether Mr. Cotton saw the Defendant in the area around the time that Mr. David Reed arrived at Mr. Cotton's home. Detective Blackwell testified that Mr. Cotton's answers to these questions during the interview differed from his testimony at trial. The recorded portion of the interview during which Mr. Cotton made the statements was played for the jury at trial and entered as an exhibit. According to the recording, Mr. Cotton told the detectives that Ms. Hines

and Ms. Scott were "cussing" the Defendant out and that the Defendant was angry because either Ms. Hines or Ms. Scott had refused to have sex with him. Mr. Cotton also stated that less than two minutes after Mr. David Reed came to his home, Mr. Cotton saw the Defendant outside and that Mr. David Reed was running from the Defendant.

On cross-examination, Detective Blackwell testified that he was aware that the front door of Mr. David Reed's home was locked when first responders arrived and that the door had to be forced open. Detective Blackwell did not know what kind of lock was on the door. He noted that the house was condemned by city code inspectors the next day.

Detective Blackwell testified that Mr. David Reed stated that he had attempted to have sex with Ms. Hines at the party, that Ms. Hines had either pushed him away or asked him to stop, and his DNA may have been on Ms. Hines. Detective Blackwell did not ask the medical examiner to examine Ms. Hines for the presence of semen, noting that Mr. David Reed never mentioned getting semen on Ms. Hines and that there was nothing to indicate that Mr. David Reed assaulted her.

Detective Blackwell stated that he was aware that Ms. Hines's father was shot and killed approximately six months prior to Ms. Hines's death and that Ms. Hines was present either at the time of or immediately after the shooting. The investigation into her father's death was ongoing at the time of the Defendant's trial. Detective Blackwell did not send additional evidence to the TBI to confirm whether the cartridge casings from the scene were actually linked to a prior shooting as indicated from the database because he conducted an investigation and determined that the two shootings were not related.

On redirect examination, Detective Blackwell testified that he did not have the opportunity to collect the Defendant's cell phone, the firearm that he possessed on the night of the party, or the clothes that he wore to CBC. Detective Blackwell stated on recross examination that the Defendant refused to talk to him following his arrest.

Dr. Steven Cogswell, a forensic pathologist with the Hamilton County Medical Examiner's Office, performed the autopsies of Ms. Hines and Mr. Taylor. Dr. Cogswell testified that both victims died from multiple gunshot wounds and that the manner of death for both victims was homicide. Both victims had Xanax and marijuana metabolites in their blood.

Dr. Cogswell testified that Mr. Taylor sustained three gunshot wounds from an undetermined range, and Dr. Cogswell was unable to determine the order in which the wounds were received. One projectile entered behind Mr. Taylor's right ear and exited in the center of his forehead. The wound would have been immediately incapacitating and

- 15 -

fatal. A second projectile entered on top of the left shoulder, traveled through the muscle of the left upper back, and exited at the shoulder blade. The projectile did not strike any large blood vessels or organs and would not have been incapacitating or fatal alone. A third projectile entered on the back of Mr. Taylor's right shoulder, severed the right carotid artery, continued through the voice box, and exited through the left side of his jaw. This was a fatal wound that would have caused a large amount of internal bleeding.

Dr. Cogswell testified that Ms. Hines sustained five gunshot wounds. One projectile entered Ms. Hines's left temple and exited at her right temple, resulting in a fatal wound. Dr. Cogswell stated that the wound was an intermediate range wound, meaning that the barrel of the gun was between one and four feet away when it was shot. He said that based on the "loose" and "sparse" gunpowder stippling around the wound, the barrel of the gun was at the "outer edge" of the three-to-four-foot range. The remainder of Ms. Hines's gunshot wounds were sustained at an undetermined range. A second projectile entered the outside of Ms. Hines's left breast; traveled through her chest wall, left lung, heart, and right lung; and exited the back of the right side of her chest. Dr. Cogswell stated that this was a fatal gunshot wound that took a "fairly horizontal pathway" across Ms. Hines's chest. A third projectile entered Ms. Hines's left upper arm near her elbow, traveled through the muscle and soft tissue in the upper arm, and exited on the inner portion of her left upper arm. A fourth projectile entered through the palm near Ms. Hines's right ring finger and exited on the nail surface of the same finger. A fifth projectile created a "skipping" pathway across Ms. Hines's abdomen during which the projectile tunneled underneath portions of her skin and soft tissue. Dr. Cogswell stated that Ms. Hines must have had her abdomen flexed when she received the injury. This injury was not fatal and did not cause significant bleeding.

Dr. Cogwell examined photographs of the scene and information he obtained from the autopsies to determine the locations in which Ms. Hines and Mr. Taylor "most likely" were when they were shot. He stated that Ms. Hines's wounds were consistent with her being shot while sitting on the couch in the living room and then trying to stand up. Dr. Cogswell testified that Mr. Taylor's wounds were consistent with his getting up off the couch while being shot, moving somewhat, and then falling. The gunshot wound to Mr. Taylor's head could have been sustained while he was either lying on the ground or standing. Dr. Cogswell stated that the wounds were consistent with the shooter standing in the doorway when Mr. Taylor and Ms. Hines were shot.

Dr. Cogswell reviewed Ms. Scott's medical records and examined her scars, and he testified that she sustained three gunshot wounds. One projectile caused a grazing wound across the upper portion of her right breast, and a second projectile entered and exited her right forearm. A third projectile entered through Ms. Scott's lower thigh just above her right knee, traveled through her femur and her knee joint, and exited toward

the front of her knee.  Dr. Cogswell stated that Ms. Scott's wounds were consistent with her sitting in a chair and the shooter standing in a doorway when she was shot.

On cross-examination, Dr. Cogswell agreed that the scenario regarding Ms. Scott's receiving her wounds was based on her sitting in the chair "in a normal fashion." He stated that the items surrounding the chair as depicted in the photographs left little room for Ms. Scott to sit in some other position.  He agreed that he did not know whether Ms. Scott was slumped over when she was shot, that he did not have any information regarding her exact position, and that he did not know where her body ended up after she was shot.

Dr. Cogswell identified a sketch prepared with regard to the shooting of Ms. Hines's father and noted that he sustained a gunshot wound to the left side of his head. He stated that he did not find the fact that both Ms. Hines and her father were shot on the left side of their heads was significant because the position of those wounds was not unique.

**Defense Proof**

The Defendant presented the testimony of CPD Sergeant Victor Miller regarding his investigation in the death of Ms. Hines's father in March of 2016.  Sergeant Miller stated that the investigation was ongoing and that the Defendant was not a suspect.  Ms. Hines was present in the home when her father was murdered, and Sergeant Miller interviewed her on the following day.  The defense played a portion of the video-recorded interview during which Ms. Hines stated that she was afraid that she was providing too much information to the police, that she did not want to die also, and that she did not feel safe.  On cross-examination, Sergeant Miller testified that the recording only depicted a small portion of the forty-five-minute interview and that one or two days later, Ms. Hines did not express fear for her safety when he showed her a series of photographic lineups.  Sergeant Miller noted that two other witnesses who were present at the time of the shooting were still alive.  Sergeant Miller met with Detective Blackwell, and they found no evidence linking Ms. Hines's death with her father's death.

Mr. Christopher Harper, a critical care paramedic who responded to the scene of the shooting and made contact with Ms. Scott, testified that according to his records, Ms. Scott was awake and alert, complained of severe right leg pain, advised that she did not wish to discuss the shooting, and denied any loss of consciousness.  Mr. Harper stated that minimal external bleeding was observed around her leg because the large amount of swelling prevented the blood from exiting.

- 17 -

Ms. Terri Broadnax-Wherry, the Defendant's aunt, testified that on the morning of September 5, 2016, she went to the home of Mr. Cotton's aunt, who lived next to Mr. Cotton, once she saw news about the shooting on television. Ms. Broadnax-Wherry arrived between 9:10 a.m. and 9:15 a.m. and sat on the front porch with others. She stated that when she arrived, she saw several people, including Mr. Cotton, Mr. David Reed, and Mr. Dan Reed's other son, in Mr. Cotton's yard, and that they appeared "really agitated and nervous." Mr. Cotton was pacing with his hands up. Ms. Broadnax-Wherry stated that at one point, she saw a car pull up and that once Mr. David Reed saw the car, he took off running toward a nearby wooded area. After the car drove away, Mr. Dan Reed arrived, and Mr. David Reed got into Mr. Dan Reed's car.

Ms. Broadnax-Wherry testified that she saw Mr. Cotton and Mr. Dan Reed's other son engage in a confrontation, during which another man got in between them. She stated that after the confrontation, the men in the yard "put their hands in" together as if they were "making an agreement." Sometime around noon, she saw Mr. Cotton put a black trash bag that contained something that was not "really small" in the trunk of a car and then drive away. Ms. Broadnax-Wherry also saw smoking coming from a burn barrel located at the back of Mr. Cotton's home.

On cross-examination, Ms. Broadnax-Wherry testified that Mr. Cotton exited his home with the trash bag. She did not know where Mr. Cotton went when he drove away, how long he was gone, or whether the trash bag was still in the trunk of the car when he returned. Ms. Broadnax-Wherry acknowledged that it was not unusual for Mr. Cotton to use the burn barrel. From where she was sitting, she could not see anyone place anything into the barrel or what was in the barrel. She could only see smoke coming from the barrel. She acknowledged that she did not speak to the police about her observations until July 2018, almost two years after the shooting.

Ms. Sara Cotton, Mr. Cotton's grandmother with whom he lived, testified by deposition that at approximately 5:30 a.m. on the morning of the shooting, the Defendant came to her home and asked for Mr. Cotton. She did not know from which direction the Defendant came. She spoke to the Defendant while he remained on the front porch, and she stated that the Defendant did not appear to be nervous. Ms. Cotton did not recall whether she saw Mr. David Reed or Mr. Cotton that day. On cross-examination, Ms. Cotton testified that she spoke to the Defendant through the storm door while he remained on the front porch. She told the Defendant that Mr. Cotton was sleeping and refused to awaken him.

The jury convicted the Defendant of two counts of first degree premeditated murder and one count each of attempted first degree murder, aggravated assault, and employing a firearm during the commission of a dangerous felony. The trial court

merged the attempted first degree murder and aggravated assault convictions and imposed an effective sentence of life imprisonment plus twenty-six years. The Defendant filed a motion for new trial, which the trial court denied following a hearing.

## ANALYSIS

### I. Sufficiency

The Defendant challenges the sufficiency of the evidence supporting his convictions, asserting that the evidence is insufficient to establish his identity as the shooter or premeditation as an element of his convictions for premeditated first degree murder and attempted first degree murder. The State responds that the evidence is sufficient to support his convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). As the trial court instructed the jury, "[a] person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense … [a]cts with intent to cause a result that is an element of the offense, and believes the

conduct will cause the result without further conduct on the person's part."  T.C.A. § 39-12-101(a)(2).  As related to the present case, a person commits aggravated assault who intentionally or knowingly causes bodily injury to another, and the assault "[i]nvolved the use or display of a deadly weapon."  T.C.A. §§ 39-13-101(a)(1); 39-13-102(a)(1)(A)(iii).  The employment of a firearm during the commission of or attempt to commit a dangerous felony or during the flight or escape from the commission of or attempt to commit a dangerous felony is a criminal offense.  T.C.A. § 39-17-1324(b).  The State relied on the attempted first degree murder charge as the dangerous felony.  *See* T.C.A. § 39-17-1324(i)(1)(A).

## A.  Identity

Identity is an essential element of every crime.  *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015).  The identification of the perpetrator of a crime is a question of fact for the jury.  *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005).  In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'"  *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

The evidence presented at trial established that earlier in the night, Ms. Hines and Ms. Scott refused to share their drugs with the Defendant and refused to allow him to play pool with them.  The Defendant became angry when Ms. Scott vomited in the bathroom, and he demanded that everyone leave the home.  The victims refused to leave, and Ms. Scott and Ms. Hines argued with the Defendant.  As they continued to argue, Mr. David Reed left the home and began walking down the street.  The evidence established that the only people left inside the home were the Defendant and the victims.  As Mr. David Reed was walking down the street, he heard multiple gunshots and ran to Mr. Cotton's home, telling Mr. Cotton, "He killed them, he killed them."  Of the four people who remained inside the home after Mr. David Reed left, only the Defendant was not shot or otherwise injured.  The victims were shot with the same nine-millimeter gun, and the Defendant carried a nine-millimeter gun during the party.  Following the shooting, the Defendant fled the scene, went to his aunt's house, and had her pay for him to stay at a motel room that was registered under his aunt's name.  Once police officers discovered his location, the Defendant again fled to another location.  While in hiding, the Defendant called Mr. David Reed and threatened him, warning him not to talk to the police.  The Defendant also posted a video recording on Facebook in which he did not deny shooting the victims but, instead, acknowledged that he was aware that he was wanted by the police, and maintained that the feeling of disrespect and not the denial of his sexual advances would lead him to go on a "rampage."  We conclude that this evidence is sufficient to support the jury's finding that the Defendant was the shooter.

## B. Premeditation

The Defendant challenges his premeditated first degree murder and attempted first degree murder convictions, arguing that the evidence is insufficient to establish premeditation. A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.*

Premeditation is a question of fact for the jury's determination. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). It may be established by any evidence which could lead a rational trier of fact to infer that premeditation was established by the proof as required by statute. *Id.* at 615. Courts frequently look to the circumstances surrounding a killing to discern the presence of evidence sufficient to support a finding of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013). Factors which tend to support the existence of premeditation include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing. *Bland*, 958 S.W.2d at 660. The factors listed in *Bland* are not exhaustive, however. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). The nature of the killing or evidence establishing a motive for the killing may also support a conclusion that the crime was premeditated. *Id.* Repeated blows, although not alone sufficient to establish premeditation, may be a relevant factor in determining the existence of premeditation. *Id.* Mutilation of the body may show that a killing was not rash or impulsive. *Davidson*, 121 S.W.3d at 616. Lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *Larkin*, 443 S.W.3d at 815-16 (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)).

When viewed in the light most favorable to the State, the evidence presented at trial established that Ms. Scott and Ms. Hines refused to share their drugs with the Defendant or allow him to play pool with them. The Defendant became angry when Ms. Scott vomited in the bathroom sink, and he demanded that the victims leave. The victims refused, and the Defendant began arguing with Ms. Scott and Ms. Hines. While standing at a doorway, the Defendant shot the unarmed victims numerous times while they were sitting down. Two of the victims were shot in the head, and ten bullet casings were recovered. The Defendant did not render aid to the victims but, instead, fled the scene

and hid in a motel room registered under his aunt's name. In a video recording on Facebook, the Defendant suggested that he shot the victims for being disrespectful to him. The gun that he used to shoot the victims was never recovered. We conclude that this evidence is sufficient to establish premeditation.

## II. *Batson* Violation

During voir dire, the trial court denied the Defendant's challenge, pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), to the State's striking a prospective juror who was African American. The Defendant asserts that the trial court failed to make the requisite findings in denying the challenge, and he urges this court to remand the case to the trial court for a new hearing. The State responds that the trial court properly found that the Defendant failed to make out a prima facie case of discrimination.

### A. Proceedings in the Trial Court

During voir dire, the prosecutor asked prospective juror number 10 ("Juror 10"), who was retired, whether she was looking forward to being sequestered, and Juror 10 replied that she was not. After the trial court explained sequestration, Juror 10 asked whether she would be required to go to the hotel that night, and the trial court affirmed that she would. Juror 10 stated that she did not drive and that she did not have anyone to drive her to the hotel because her son was out of the country. The trial court stated that it was possible that someone from the sheriff's department could drive Juror 10 to the hotel. Juror 10 affirmed that she would not be distracted by staying at a hotel but that her only issue was the lack of transportation to the hotel. She also affirmed that she could be fair and impartial. Later during voir dire, Juror 10 again expressed concern that she did not have transportation to the hotel.

At the conclusion of voir dire, the State struck Juror 10, and defense counsel objected based upon *Batson*. The following exchange occurred:

> THE COURT: No, it's premature at this point because they've only used one challenge. The Court doesn't find there's a pattern.
>
> [DEFENSE COUNSEL]: A pattern.
>
> THE COURT: The Court has to find a pattern of discriminatory action before the State has to provide any race-neutral explanation.
>
> [DEFENSE COUNSEL]: I thought if we made a prima facie case, they would have to answer what their neutral basis was?

- 22 -

THE COURT: One person doesn't make a prima facie case.

[DEFENSE COUNSEL]: Judge, juror number 10 was African American, and she gave no reasons for being struck and that's why I'm making a challenge.

THE COURT: Well, the State doesn't have to give a reason yet. I think there has to be a pattern—

[DEFENSE COUNSEL]: I have an objection.

THE COURT: --and I don't think one person constitutes a pattern.

After the Defendant was convicted of the offenses, he alleged in his motion and amended motion for new trial that the trial court erred in denying his *Batson* claim. Although the State filed a written response to the Defendant's motion, the State did not address the *Batson* issue.

During a status hearing prior to the hearing on the motion for new trial, the trial court stated that it had conducted additional research on the *Batson* issue and had reviewed the trial transcript. The trial court stated, "I did not recall this, but that juror was an elderly woman who had—she could not drive and she had issues related to her transportation. That was not provided as a race-neutral reason, but it certainly would have been one." The trial court continued, "I, in looking at the law, don't believe that there was any prima facie showing of any kind of pattern of discrimination, which has to be shown."

During the hearing on the motion for new trial, defense counsel argued that the trial court erred in finding that the defense was required to establish a pattern of discrimination in order to demonstrate a prima facie case under *Batson*. Defense counsel also argued that Juror 10 was African American, that the State gave no reasons for striking the juror, and that the trial court failed to make adequate findings in denying the *Batson* challenge. The trial court responded:

I do recall from reading the transcript in preparation for this hearing, and because the Court did not make any further statement in the record at the time of the trial related to this proceeding, as I went back and read it, that the juror who was excused had expressed—I believe she was an elderly woman—I think she was in her eighties—and she also indicated that she did not drive, and there was going to be—there had already been something

- 23 -

come up about traveling to and from court to home and to the hotel, and I think I had indicated whether or not—my thought process about whether or not the sheriff could assist her with that, so the State never gave a reason, but I think it is significant that those things existed also at the time.

The trial court asked the prosecutor why the juror was stricken, and the prosecutor responded, "Just that that was the reason for—that was the reason she was struck, because of her issues, I guess, with transportation, and her age. It had nothing to do with the fact that she was African American." The trial court stated, "While the Court does not want to discriminate—would not be based on age either—and certainly, I know that at the time I had it in my mind as well that the situation of sequestration could be a hardship on a person of that age." The trial court noted that one of the jurors who sat on the jury was African American. The trial court did not make any further findings on the *Batson* issue and did not address the issue in its written order.

## B. Analysis

"'Peremptory challenges, along with challenges for "cause," are the principal tools that enable litigants to remove unfavorable jurors during the jury selection process.'" *State v. Spratt*, 31 S.W.3d 587, 598 (Tenn. Crim. App. 2000) (quoting *United States v. Annigoni*, 96 F.3d 1132, 1137 (9th Cir. 1996), *overruled on other grounds as recognized in United States v. Lindsey*, 634 F.3d 541, 544 (9th Cir. 2011)). A peremptory challenge allows for the removal of jurors who may exhibit hostility or bias but whose removal for cause has not been established. *Id.*

However, the use of a peremptory challenge to remove a juror on the basis of race violates the Equal Protection Clause of the Fourteenth Amendment. *Batson*, 476 U.S. at 89; *State v. Hugueley*, 185 S.W.3d 356, 368 (Tenn. 2006). In *Batson*, the United States Supreme Court established a three-step process that a trial court must undertake to determine whether a juror was improperly challenged on the basis of race. 476 U.S. at 97-98. First, the defendant must make a prima facie showing of purposeful discrimination against a venire member. *Id.* at 93-94. A defendant "may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* Under this first step, the defendant need not establish that the State's challenge was "more likely than not the product of purposeful discrimination." *Johnson v. California*, 545 U.S. 162, 170 (2005). A defendant can establish a prima facie case merely by demonstrating that the State excluded members of a cognizable racial group from the jury pool. *State v. Echols*, 382 S.W.3d 266, 281 (Tenn. 2012). Furthermore, "the exercise of even one peremptory challenge in a purposefully discriminatory manner would violate equal protection." *State*

*v. Ellison*, 841 S.W.2d 824, 827 (Tenn. 1992) (concluding that *Batson* applied even though only one member of the venire belonged to the cognizable racial group).

If the defendant establishes such a prima facie case, the burden shifts to the State to articulate a race-neutral reason for excluding the juror or jurors. *Batson*, 476 U.S. at 97. The prosecutor may not merely assert that the reason for the challenge was not discriminatory. *Ellison*, 841 S.W.2d at 827. The State's race-neutral explanation "must be a clear and reasonably specific account of the prosecutor's legitimate reasons for exercising the challenge … [but] need not be persuasive, or even plausible." *Hugueley*, 185 S.W.3d at 368 (citing *Batson*, 476 U.S. at 98 n.20; *Purkett v. Elem*, 514 U.S. 745, 767-68 (1995)). The State's explanation need not include a reason that would justify excusing the juror for cause. *Batson*, 476 U.S. at 97. "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race[-]neutral.'" *Hugueley*, 185 S.W.3d at 368 (quoting *Purkett*, 514 U.S. at 768).

Finally, if the State offers a race-neutral reason, the trial court must determine if the defendant has established purposeful discrimination. *Batson*, 476 U.S. at 98. This step requires that the trial court examine the State's reasoning to ensure it is not pretextual. *Hugueley*, 185 S.W.3d at 368. When considering this third step, "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed." *Hernandez v. New York*, 500 U.S. 353, 365 (1991). "'The trial court may not simply accept a proffered race-neutral reason at face value but must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual.'" *State v. Kiser*, 284 S.W.3d 227, 255 (Tenn. 2009) (quoting *Hugueley*, 185 S.W.3d at 368).

"[D]etermination of the prosecutor's discriminatory intent or lack thereof turns largely on the evaluation of the prosecutor's credibility, of which the attorney's demeanor is often the best evidence." *State v. Smith*, 893 S.W.2d 908, 914 (Tenn. 1994); *see Flowers v. Mississippi*, 139 S.Ct. 2228, 2243-44 (2019). The United States Supreme Court has recognized that a defendant may present a variety of evidence to support a claim that a prosecutor's peremptory strikes were made on the basis of race, including: (1) statistical evidence comparing the prosecutor's use of peremptory strikes against African-American jurors and Caucasian jurors in the case; (2) the prosecutor's disparate questioning of African-American and Caucasian jurors in the case; (3) "side-by-side comparisons" of African-American jurors who were struck and Caucasian jurors who were not challenged; (4) the "prosecutor's misrepresentations of the record when defending the strikes during the *Batson* hearing"; (5) relevant history of the State's use of peremptory strikes in past cases; or (6) any other relevant circumstance bearing upon the issue. *Flowers*, 139 S.Ct. at 2243. "When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent." *Id.* at

2250. A prosecution's shifting of reasons for the strike also suggests that the reasons may be pretextual. *Foster v. Chatman*, 136 S.Ct. 1737, 1751 (2016).

"[T]he ultimate burden of establishing purposeful discrimination lies with the party objecting to the peremptory challenge." *Hugueley*, 185 S.W.3d at 374 (citing *Batson*, 476 U.S. at 93). When ruling on a *Batson* challenge, the trial court must give specific reasons for each of its factual findings, including: (1) whether a prima facie case has been established; (2) whether a race-neutral reason for the challenge has been provided; and (3) whether the totality of the circumstances supports a finding of purposeful discrimination. *Id.* at 369 (citing *Woodson v. Porter Brown Limestone Co.*, 916 S.W.2d 896, 906 (Tenn. 1996)). The trial court's findings are to be accorded great deference on appeal, and this court will not set aside those findings unless they are "clearly erroneous." *Woodson*, 916 S.W.2d at 906.

The trial court improperly found that the Defendant was required to show a pattern of discrimination in order to establish a prima facie case of purposeful discrimination. Both the Tennessee Supreme Court and this court have held that it is not necessary to show a "pattern" of strikes against potential jurors of a particular race. *See e.g., Ellison*, 841 S.W.2d at 827; *Timothy Tyrone Sanders v. State*, No. M2003-02416-CCA-R3-PC, 2005 WL 354100, at *4 (Tenn. Crim. App. Feb. 15, 2005); *Benjamin Blackwell v. State*, No. W2001-02179-CCA-R3-PC, 2003 WL 402805, at *6 (Tenn. Crim. App. Feb. 12, 2003); *State v. Theddaeus Medford*, No. W2001-02930-CCA-R3-CD, 2003 WL 141049, at *3 (Tenn. Crim. App. Jan. 14, 2003). The exclusion of a single juror of a particular race may be sufficient to constitute a prima facie case. *Ellison*, 841 S.W.2d at 827; *Timothy Tyrone Sanders*, 2005 WL 354100, at *4; *Theddaeus Medford*, 2003 WL 141049, at *3.

During a post-trial status hearing, the trial court again incorrectly stated that the Defendant was required to make a "prima facie showing of any kind of pattern of discrimination." The trial court exacerbated the error by taking it upon itself to determine a reason for excluding the juror and to find that the reason was "race-neutral," instead of requiring the State to provide its reasons for excluding the juror. By doing so, the trial court assumed the State's role and burden of providing a race-neutral reason for striking the juror. The purpose of the three-step inquiry in *Batson* is not to determine whether *any* race-neutral justification existed for excluding the juror but to ascertain the State's *actual* reason for excluding the juror and determine whether the reason articulated by the State — and not by the trial court — is race-neutral.

During the hearing on the Defendant's motion for new trial, the trial court repeated the reasons that the court had found justified excluding the juror and then asked the State for its reasons for excluding the juror. The prosecutor unsurprisingly agreed with the

reasons that the trial court had articulated and previously found to be race-neutral. However, the prosecutor's response was equivocal, stating that he "guess[ed]" the juror was excluded due to her advanced age and transportation issues. The trial court failed to provide the Defendant with the opportunity to respond to the reason for excluding the juror determined by the trial court and somewhat acquiesced in by the State. The trial court made no further findings on the issue either during the hearing or in its order denying the Defendant's motion for new trial.

The trial court failed to comply with the three-step inquiry for determining a *Batson* violation and failed to make adequate findings to determine the validity of the Defendant's objection to the State's exclusion of the juror. Therefore, we remand the case to the trial court for a hearing to address the three-part test under *Batson*. *See Ellison*, 841 S.W.2d at 826; *State v. Joan Odell*, No. W2018-01341-CCA-R3-CD, 2019 WL 6499438, at *9 (Tenn. Crim. App. Dec. 3, 2019), *no perm. app. filed*; *Theddaeus Medford*, 2003 WL 141049, at *3. At the hearing, the Defendant should be given the opportunity to proceed with his efforts to establish a violation. The trial court shall make specific findings, applying the principles set forth in this opinion. If the trial court concludes that the Defendant has met his burden of establishing a *Batson* violation, the trial court shall grant the Defendant a new trial. If the trial court concludes that the State's exercise of the preemptory challenge did not violate *Batson*, the Defendant shall have the right to appeal the trial court's decision.

## III. Juror Misconduct

The Defendant asserts that a juror failed to disclose her prior knowledge of the Defendant through a family relationship during voir dire and on the written jury questionnaire. The Defendant also asserts that the same juror provided the rest of the jury with extraneous information during deliberations when she "used her specialized knowledge of a regional dialect to translate" the Defendant's statements in his Facebook video. The Defendant maintains that, as a result, his right to a fair trial with an impartial jury was violated. The State responds that the Defendant waived his claim that the juror withheld her prior knowledge of him by failing to challenge the juror's qualifications when the familiarity became apparent. The State further responds that the trial court properly found that the juror was unaware of her distant connection to the Defendant and brought no prior knowledge of him to jury deliberations. Finally, the State argues that the juror's inferences about the meaning of the Defendant's language on the Facebook video did not constitute improper extraneous information.

## A. Proceedings in the Trial Court

Prior to trial, juror number 26 ("Juror 26") completed a jury questionnaire in which she stated that she had no knowledge of the homicides of Mr. Taylor and Ms. Hines and that she had not seen any news stories or other media regarding the homicides. During voir dire, the trial court asked all of the prospective jurors whether anyone knew the Defendant, and none of the jurors indicated that they did. The State against asked the prospective jurors whether they knew the Defendant, and no one responded.

Following the July 2018 trial and the January 2019 sentencing hearing, the Defendant alleged in an amended motion for new trial filed in July of 2019 that Juror 26 had prior knowledge of the parties, which she failed to disclose during voir dire and that due to her prior knowledge, Juror 26 introduced extraneous prejudicial information during jury deliberations. The Defendant alleged that Juror 26's uncle was married to the sister of the mother of the Defendant's child.

In support of his claim, the Defendant attached the affidavit of Ms. Soronia Shant'a Millsaps, the mother of the Defendant's child. In the affidavit, which was signed and sworn on April 30, 2019, Ms. Millsaps stated that her sister was married to Juror 26's uncle from 2013 until 2017. She stated that she and the Defendant attended her sister's wedding reception and that Juror 26 also was in attendance. Ms. Millsaps also stated that she and the Defendant had attended children's birthday parties and family events in which Juror 26 was present. Ms. Millsaps believed that as a result, Juror 26 had knowledge of the Defendant prior to trial.

The Defendant also attached the affidavit of his niece, Ms. Emma Bentley, which was signed and sworn on May 8, 2019. Ms. Bentley stated that she and Juror 26 had attended school together and that they graduated high school in 2014. Ms. Bentley recalled that while they were in high school, Juror 26 approached her and stated, "I didn't know Dolla was your [u]ncle." Ms. Bentley stated in the affidavit that the conversation indicated to her that Juror 26 had knowledge of the Defendant and his nickname, "Dolla." Ms. Bentley also stated that she and Juror 26 had been friends on Facebook for several years and that Ms. Bentley frequently posted on Facebook about the Defendant, including his photograph and information about "his prior criminal charges." She stated that as a result, she believed Juror 26 had knowledge of the Defendant prior to trial.

The State filed a response, maintaining that Juror 26 had no prior knowledge of the Defendant and, therefore, did not introduce extraneous prejudicial information during jury deliberations. The State attached Juror 26's affidavit, in which she stated that she was unaware of any connection with the Defendant prior to trial, during the trial, or during jury deliberations. She stated that after the trial, a family member informed her

- 28 -

that the Defendant was her "uncle's wife's sister's husband." She denied relaying any outside information to any other juror during the course of the trial or deliberations. The State also attached the affidavits of two other jurors, both of whom stated that they were unaware of any connection between the Defendant and any other juror during the trial or deliberations and that they were unaware of any juror relaying "outside information" about the Defendant to other jurors.

On January 16, 2020, one of the Defendant's counsel signed and filed an affidavit regarding his telephone conversation with juror number 28 ("Juror 28") on October 29, 2018. Defense counsel stated that Juror 28 described comments made by Juror 26, which defense counsel believed exposed the jury to extraneous prejudicial information. Defense counsel relayed that Juror 28 stated that during deliberations, Juror 26 reviewed the Defendant's Facebook video and told other jurors the meaning of specific language used by the Defendant in the video. Defense counsel stated that Juror 28 told him that Juror 26 relied upon knowledge "of his own family members, implying it was gang related," and that Juror 26 believed "it was her service" to explain the Defendant's language. Defense counsel stated that according to Juror 28, Juror 26 believed "the colors in the evidence" were gang-related.

Prior to the hearing, the State filed a motion requesting that the trial court conduct an *in camera* examination of the jurors prior to conducting an evidentiary hearing in order to protect the jurors and their privacy. The State noted that the Defendant knew members of Juror 26's family, had a violent criminal history, was affiliated with a gang, and had threatened and attempted to influence some of the State's witnesses. The defense filed a response in opposition to the motion.

During a status hearing, the State announced that Juror 26 was upset and afraid and that she did not want to testify during an evidentiary hearing because the Defendant knew her and her family. Juror 26 contacted the prosecutor's office and reported that since the verdict, members of the Defendant's family had attempted to contact her and that "it has been ongoing…since the verdict." The trial court found that Juror 26's concern was reasonable and that the court would not require Juror 26 to testify unless the court determined that the Defendant established a prima facie case that shifted the burden to the State. The trial court instructed defense counsel to have Ms. Bentley and Ms. Millsaps present to testify at the hearing.

During the hearing on the Defendant's motion for new trial, the affidavits previously submitted by the parties were entered as exhibits. The defense also presented the testimony of Ms. Bentley, Ms. Millsaps, and Juror 28.

Ms. Bentley testified that she did not attend the Defendant's trial and that she and Juror 26 had attended school together. Ms. Bentley recalled that in 2014, when they were seniors in high school, Juror 26 approached and said she did not know that "Dolla," who is the Defendant, was Ms. Bentley's uncle. Ms. Bentley stated that while she and Juror 26 were friends on Facebook, Ms. Bentley posted photographs of the Defendant, news articles about the case, and statements such as "free my uncle."

On cross-examination, Ms. Bentley testified that the Defendant did not know who Juror 26 was at the time of trial and that she informed the Defendant of Juror 26's identity "a couple of weeks" after the trial. The Defendant told Ms. Bentley that Juror 26 looked familiar.

On redirect examination, Ms. Bentley testified that during the conversation establishing that "Dolla" was her uncle, Juror 26 responded that the Defendant was "crazy." Ms. Bentley acknowledged on recross examination that this information was not included in her affidavit even though she reviewed the affidavit before signing it to ensure that all relevant information was included. She maintained that the affidavit did not include her entire conversation with Juror 26.

In response to questioning by the trial court, Ms. Bentley testified that after the trial, family members told her about Juror 26. Ms. Bentley told her relatives that she and Juror 26 were once friends, and Ms. Bentley's aunt informed her that Juror 26 was the niece of the husband of Ms. Millsaps's sister. Ms. Bentley stated that a few weeks later, she had a telephone conversation with the Defendant and identified Juror 26. The Defendant responded that Juror 26 had looked familiar.

Ms. Millsaps, the mother of the Defendant's son, testified that she did not know where the Defendant was living prior to his arrest. She stated that her sister was married to Juror 26's uncle. Ms. Millsaps attended trial and said that while Juror 26 seemed "familiar" to her, she did not recognize Juror 26. Ms. Millsaps told the Defendant that Juror 26 seemed "familiar" after the jury was selected, and the Defendant did not tell her that he knew Juror 26.

In response to questioning by the trial court, Ms. Millsaps testified that around September of 2013, she and the Defendant attended the wedding reception of her sister and Juror 26's uncle. Juror 26 also attended the reception, and Ms. Millsaps agreed that the Defendant had the opportunity to see Juror 26 at the reception. Ms. Millsaps stated that in 2012, she and the Defendant attended parties and family events during which Juror 26 also was present. Ms. Millsaps testified that she was around Juror 26 a sufficient amount of time where Juror 26 looked familiar to her, but Ms. Millsaps was unable to recognize Juror 26 when she saw her at trial.

Juror 28 testified in response to questioning by the trial court that Juror 26, who was the only African-American juror, did not tell other jurors that she was related to the Defendant and did not provide them with any information about the Defendant that the jurors did not learn during the trial. Juror 28 recalled that the Defendant used language in the Facebook video that some of the jurors "culturally wouldn't have understood" and that Juror 26 "was able to tell us a little bit more based on her understanding, culturally, what that meant."

In response to questioning by defense counsel, Juror 28 testified that Juror 26 did not mention that any of the language used by the Defendant was gang-related, that her family members had ties to gangs, or that the colors displayed by some of the exhibits indicated gang connections. Juror 28 stated that a "gang relation possibility" was evident to some jurors based upon "the information that was received." She said that Juror 26 had either relatives or friends who had experience with gangs and "was able to understand certain gang slang that those of us that had never been in or around gang slang would not have known." Juror 28 stated that Juror 26 was not the only juror who understood the language. Juror 28 denied that Juror 26 expressed that she felt that it was "her service" to explain the Defendant's language. Juror 28 recalled that someone asked Juror 26 the meaning of some of the language and that Juror 26 explained the meaning of the words "based on her experience." Juror 28 testified that Juror 26 had to explain the language on two or three occasions, but Juror 28 could not recall the exact words that Juror 26 had to explain.

The trial court entered a written order denying the Defendant's claims. The trial court found that the jury was not exposed to extraneous information when Juror 26 explained some of the language used by the Defendant in the Facebook video. The trial court found that Juror 26's life experiences enabled her to infer facts from the evidence. The trial court credited Juror 28's testimony over the information in defense counsel's affidavit. The trial court noted that inconsistencies between Juror 28's testimony and defense counsel's affidavit were possibility related to the fact that defense counsel's conversation with Juror 28 occurred in October 2018 and the affidavit was not sworn until January 2020. The trial court found that defense counsel's affidavit describing what Juror 28 said to him about Juror 26's statements contained hearsay, which was insufficient to establish relief.

In rejecting the Defendant's claims that Juror 26 misrepresented her knowledge of the Defendant and demonstrated bias, the trial court noted that if the Defendant had expressed concern about Juror 26's seeming familiar at any time during the trial, the court could have considered excusing her as an alternate. The trial court also noted that despite Ms. Millsaps's allegations that she and the Defendant had attended events during which Juror 26 was present, neither Ms. Millsaps nor the Defendant could recognize

Juror 26 other than to say that she looked familiar. The trial court found that the failure of Ms. Millsaps and the Defendant to recognize Juror 26 corroborated Juror 26's statement that she, too, was unaware of any connection to the Defendant at any time prior to the conclusion of her jury duty.

The trial court expressed "concern[]" regarding Ms. Bentley's testimony, which was absent from her affidavit, that Juror 26 called the Defendant "crazy" during a conversation that occurred approximately five years prior to Ms. Bentley's testimony, "especially considering the length of time that has expired since her alleged conversation with [Juror 26], and the fact that the Defendant is her uncle, giving her the opportunity for bias or personal interest in how the case is decided." The trial court found that any claim that Juror 26's Facebook friendship with Ms. Bentley must have resulted in Juror 26's recognizing the Defendant due to Ms. Bentley's posts pertaining to his charges was rebutted by Juror 26's responses to the jury questionnaire in which she denied knowing any information about the homicides.

The trial court found that Juror 26's responses to voir dire questions established that she did not recognize the Defendant and that no evidence was presented suggesting any reason for Juror 26 to have been untruthful. The trial court also found that based upon the totality of the evidence, including the affidavits of other jurors, Juror 26's explanations as provided in her affidavit were credible. The trial court did not require Juror 26 to testify at a hearing but determined that her affidavit constituted sufficient proof. In determining whether to require Juror 26 to testify, the trial court considered its observation of Juror 26 during voir dire and the public policy considerations behind Tennessee Rule of Evidence 606(b), which include "the prevention of jury harassment, encouragement of free and open jury deliberation, promotion of finality of verdicts, and the reduction of the incentive for jury tampering." Based upon Juror 26's responses to questioning during voir dire, her affidavit, and the affidavits of other jurors, the trial court concluded that Juror 26 did not know who the Defendant was until after her duty as a juror concluded, that she did not intentionally fail to disclose information during voir dire, and that she did not engage in any misconduct. The trial court determined that the Defendant failed to establish by a preponderance of the evidence that Juror 26 engaged in misconduct.

## B. Analysis

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to a trial by an impartial jury. "An unbiased and impartial jury is one that begins the trial with an impartial frame of mind, that is influenced only by the competent evidence admitted during the trial, and that bases its verdict on that evidence." *State v. Smith*, 418 S.W.3d 38, 45 (Tenn. 2013) (citing

*State v. Adams*, 405 S.W.3d 641, 650-51 (Tenn. 2013); *Durham v. State*, 188 S.W.2d 555, 558 (Tenn. 1945)). The Defendant raises two allegations of juror misconduct on appeal: (1) Juror 26 failed to disclose her knowledge of the Defendant during voir dire; and (2) Juror 26 provided the other jurors with extraneous prejudicial information during deliberations.

### 1. Failure to Disclose During Voir Dire

This court has recognized the importance of guarding the jury selection process to ensure that a defendant is afforded a fair trial and that the verdict is reached by an impartial jury. *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993). "'The ultimate goal of voir dire is to ensure that jurors are competent, unbiased and impartial.'" *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011) (quoting *State v. Hugueley*, 185 S.W.3d 356, 390 (Tenn. 2006)). Challenges to a juror's qualifications generally fall into two categories: *propter defectum* ("on account of defect") and *propter affectum* ("on account of prejudice"). *Carruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (citing *Akins*, 867 S.W.2d at 355). *Propter defectum* challenges which are "based upon general disqualifications, such as alienage, family relationship, or statutory mandate," must be raised prior to the return of the verdict. *Id.* *Propter affectum* challenges, which are "based upon the existence of bias, prejudice, or partiality towards one party in the litigation actually shown to exist or presumed to exist from circumstances," may be raised after the verdict in a motion for new trial. *Id.* The Defendant makes a *propter affectum* challenge, alleging bias by Juror 26.

Voir dire provides for the impaneling of a fair and impartial jury through questions that allow counsel to intelligently exercise challenges. *Akins*, 867 S.W.2d at 354. Counsel's full knowledge of the facts that might bear upon a juror's qualifications is essential to the intelligent exercise of peremptory and for-cause challenges. *Id.* at 355. Jurors, therefore, are obligated to make "'full and truthful answers … neither falsely stating any fact nor concealing any material matter.'" *Id.* (quoting 47 Am. Jur. 2d, Jury § 208 (1969)).

The defendant has the burden of establishing a prima facie case of bias or partiality. *Id.* A presumption of prejudice arises when "a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality." *Id.* Silence in the face of a material question reasonably calculated to elicit a response is equivalent to a negative answer. *Smith*, 357 S.W.3d at 348. The State may rebut the presumption through evidence establishing the absence of "actual prejudice" or "actual partiality." *Akins*, 867 S.W.2d at 357. In determining whether the presumption is overcome, the trial court "must view the totality of the circumstances, and not merely the juror's self-serving claim of lack of partiality." *Id.*

The State maintains that the Defendant waived this issue by failing to challenge Juror 26 at trial. "Even in cases of *propter affectum*, challenges after the verdict are not proper unless the 'particular disqualification of a juror was unknown to the defendant and his attorney at the time of the jury's selection.'" *State v. Jay Chambers*, No. E2002-01308-CCA-R3-CD, 2004 WL 626715, at *4 (Tenn. Crim. App. Mar. 25, 2004) (quoting *Durham v. State*, 188 S.W.2d 555, 557 (Tenn. 1945)). According to the evidence presented at the motion for new trial hearing, the Defendant did not recognize Juror 26 at trial but only stated that she looked familiar. Under these circumstances, we cannot conclude that the Defendant waived this issue by failing to bring Juror 26's mere familiarity to the trial court's attention during the trial.

As found by the trial court, the Defendant failed to establish that Juror 26 recognized the Defendant from the events that they both attended six to seven years prior to trial when neither the Defendant nor Ms. Millsaps were able to recognize Juror 26 from the events. Although Ms. Bentley testified regarding Juror 26's knowledge of the Defendant based upon Ms. Bentley's conversation with Juror 26 approximately four years prior to trial and Ms. Bentley's Facebook posts about the Defendant, the trial court declined to credit Ms. Bentley's testimony. The trial court's factual findings, such as the credibility and weight afforded to a witness's testimony, is reviewed on appeal de novo, accompanied by a presumption of correctness unless the evidence preponderates otherwise. *Adams*, 405 S.W.3d at 656 (citing Tenn. R. App. P. 13(d); *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001)). The trial court found that Juror 26's statement in her affidavit that she was unaware of her connection with the Defendant until after her jury obligations concluded was supported by the affidavits and testimony of other jurors that no one on the jury mentioned a connection with or prior knowledge of the Defendant during the trial or deliberations. The evidence presented at the hearing does not preponderate against the trial court's findings.

The Defendant asserts that the trial court erred in relying upon Juror 26's affidavit and, instead, should have required Juror 26 to be present to testify at the hearing. Insofar as the Defendant challenges the trial court's reliance on Juror 26's affidavit, we note that the affidavit was entered as an exhibit at the hearing without objection by the defense. Thus, the Defendant may not claim for the first time on appeal that the trial court erred in considering the affidavit. *See* Tenn. R. App. P. 36(a) (providing that appellate courts need not grant relief when the objecting party "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); *State v. Johnson*, 970 S.W.2d 500, 508 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived.").

With regard to the Defendant's claim that the trial court should have required Juror 26 to testify at the hearing, our supreme court has stated,

> when misconduct involving a juror is brought to a trial court's attention, "it [is] well within [the judge's] power and authority to launch a full scale investigation by summoning … all the affiants and other members of the jury, if need be, with a view of getting to the bottom of the matter, and thus, if necessary, upon [the judge's] own motion."

*Smith*, 418 S.W.3d at 46 (quoting *Shew v. Bailey*, 260 S.W.2d 362, 368 (Tenn. Ct. App. 1951)). Courts have recognized the "general reluctance to 'haul jurors in after they have reached a verdict in order to probe for potential instances of … misconduct.'" *State v. James Webb*, No. 02C01-9512-CC-00383, 1997 WL 80971, at *11 (Tenn. Crim. App. Feb. 27, 1997) (quoting *United States v. Infelise*, 813 F. Supp. 599, 605 (N.D. Ill. 1993)); *see State v. Kevin Waggoner*, No. E2018-01065-CCA-R3-CD, 2019 WL 4635589, at *20 (Tenn. Crim. App. Sept. 24, 2019), *perm. app. denied* (Tenn. Feb. 19, 2020). Such post-verdict inquiries may lead to the harassment of jurors, the inhibition of jury deliberations, an increase in meritless pleadings, an increased temptation to tamper with the jury, and uncertainty in jury verdicts. *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2005).

Prior to the evidentiary hearing, the State announced that Juror 26 was afraid of testifying in the Defendant's presence, that the Defendant knew Juror 26 and her family, and that the Defendant's family members had made "ongoing" efforts to contact Juror 26 since the verdict. There was proof at trial that the Defendant had threatened one witness. The trial court expressed concern regarding the harassment of Juror 26 by the Defendant's family and ultimately determined that Juror 26's testimony was unnecessary. Based upon evidence presented at trial regarding the Defendant's prior threatening of witnesses, his family's harassment of Juror 26, her fear of testifying, and the trial court's credibility determinations regarding the witnesses presented by the Defendant at the hearing, we conclude that the trial court did not err in determining that Juror 26's presence and testimony were unnecessary.

We must determine whether the Defendant established a prima facie case of bias when Juror 26 failed to reveal her connection with the Defendant at trial but was unaware of that connection until after the verdict. In *State v. Akins*, this court noted that when a juror provides false or misleading responses during voir dire, intent is not dispositive and that a mistaken answer also raises a presumption of bias. *Akins*, 867 S.W.2d at 356 n.15; *see State v. Willie Calvin Taylor, Jr.*, No. W2011-00671-CCA-R3-CD, 2012 WL 2308088, at *8 (Tenn. Crim. App. June 18, 2012). *Akins*, however, did not involve a juror who provided a mistaken answer; rather, the jury in *Akins* deliberately provided false answers and demonstrated actual bias against the defendant. *Id.* at 357. The court in *Akins* cited to *Hyatt v. State*, 430 S.W.2d 129 (Tenn. 1967), to support the proposition that intent is not dispositive. *Akins*, 867 S.W.2d at 356 n.15. In *Hyatt*, the juror did not

realize that he knew the defendant as someone against whose premises the juror previously had secured a search warrant until another juror referred to the defendant by a nickname during deliberations. *Hyatt*, 430 S.W.2d at 129-30. Although the court noted that "'[w]here the jury or juror has prejudiced the case, and the knowledge of his bias or prejudice is unknown until after the verdict, the courts say it must be presumed that his prejudices enter into and become a part of the result,'" the court's reversal of the conviction also was based on the finding that the juror was actually hostile to the defendant. *Id.* (quoting *McGoldrick v. State*, 21 S.W.2d 390, 391 (Tenn. 1929)).

Unlike the juror in *Hyatt* who learned of his connection to the defendant during deliberations and before a verdict had been rendered, the trial court found that Juror 26 did not learn of her connection to the Defendant until deliberations had concluded and a verdict had been rendered. This court has recognized that "'bias of the juror, ignorant of the relationship until after the verdict, cannot be presumed.'" *State v. Johnny W. Raines*, No. 86-224-III, 1987 WL 16072, at *3 (Tenn. Crim. App. Aug. 26, 2987) (quoting *Nashville, Chattanooga & St. Louis Railway v. Williams*, 46 S.W.2d 814, 815 (Tenn. 1932)). This court has declined to grant a defendant relief based upon a juror's failure to reveal a relationship with one of the parties when the juror did not learn of the relationship until after the verdict was rendered. *See, e.g. State v. Daniel Darrell Inman*, No. E2005-01010-CCA-R3-CD, 2006 WL 3718235, at *19 (Tenn. Crim. App. Dec. 18, 2006) (noting that because the juror did not learn that his friend was the prosecutor's brother until after the trial had ended, the juror "could not be expected to disclose such information during voir dire or during the trial"); *Murphy v. State*, 560 S.W.2d 414, 415 (Tenn. Crim. App. 1977) (holding that "no prejudice to the defendant can be shown" when a juror had no knowledge of her relationship to one of the parties at the time the juror was seated and did not learn of the relationship until after the trial was completed).

Because Juror 26 was unaware of any connection with the Defendant at the time of trial, Juror 26 could not have been expected to reveal the connection during voir dire or during the trial. Furthermore, Juror 26 could not have relied upon, considered, or otherwise utilized that connection in rendering a verdict. Therefore, we conclude that the Defendant failed to establish a prima facie case of bias and is not entitled to relief.

## 2. Extraneous Prejudicial Information

Our supreme court has recognized that a jury's exposure to extraneous prejudicial information or improper outside influence during trial renders the validity of the verdict "questionable." *Adams*, 406 S.W.3d at 650 (citing *State v. Blackwell*, 664 S.W.2d 686, 688 (Tenn. 1984)). Extraneous prejudicial information is defined as "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* (citations omitted). "An improper outside influence is

any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Id.* at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)).

The party challenging the validity of the verdict has the burden of presenting admissible evidence that the jury was exposed to extraneous prejudicial information or to an improper outside influence. *Id.* External influences that may warrant a new trial if prejudicial include: "'(1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence; and (3) communication with non-jurors about the case.'" *Carruthers v. State*, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (quoting *Caldararo v. Vanderbilt Univ.*, 794 S.W.2d 738, 742 (Tenn. Ct. App. 1990)). Internal influences that do not constitute grounds for relief include: "'(1) discussions among jurors; (2) intimidation or harassment of one juror by another; (3) a juror's personal experiences not directly related to the litigation; and (4) a juror's subjective thoughts, fears, and emotions.'" *Id.* (quoting *Caldararo*, 794 S.W.2d at 742). Once the challenging party meets his or her burden of making an initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises, and the burden shifts to the State to explain the conduct or establish that the conduct was harmless. *Adams*, 405 S.W.3d at 651 (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)).

Trial courts are guided by Tennessee Rule of Evidence 606(b) in determining whether evidence is admissible to challenge a verdict. Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Rule 606(b) "permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however, juror testimony concerning the effect of such information or influence on the juror's deliberative process is inadmissible." *Walsh*, 166 S.W.3d at 649.

The Defendant maintains that Juror 26's explanation to other jurors of the words that the Defendant used in the Facebook video constituted extraneous prejudicial information. The trial court found that Juror 26's explanation did not constitute extraneous information. In reaching this conclusion, the trial court credited Juror 28's testimony over defense counsel's affidavit, which the trial court noted included hearsay about a conversation that occurred months before the affidavit was sworn.

The Defendant presented no evidence that Juror 26's explanation was based upon her personal experience with or knowledge of the Defendant. Rather, Juror 28 testified that Juror 26 mentioned that her explanation was based upon her personal experience with family members, who were affiliated with gangs. This court has held that "information that can be inferred from the evidence offered at trial is not extraneous information." *State v. Crenshaw*, 64 S.W.3d 374, 393 (Tenn. Crim. App. 2001). "'[J]urors are free to use their common knowledge and judgment derived from experience, observation, and reflection to decide whether a fact is logically deducible or reasonably inferred from the evidence.'" *Id.* (quoting *State v. Nesbit*, 978 S.W.2d 872, 886 (Tenn. 1998)). Juror 26 simply used her knowledge and experience to infer the meaning of the words used by the Defendant in a Facebook video that was entered as an exhibit at trial. We conclude that Juror 26's explanation did not constitute extraneous information. Therefore, the Defendant is not entitled to relief regarding this issue.

## IV. Excited Utterance

The Defendant contends that the trial court erred in admitting Mr. Dan Reed's testimony that Mr. David Reed informed him that the Defendant warned Mr. David Reed against providing any information about the shootings to the police. The Defendant maintains that Mr. Dan Reed's testimony was inadmissible hearsay and that the trial court erred in admitting the testimony under the hearsay exception for excited utterances. The State responds that the trial court properly found that Mr. David Reed's statement met the requirements of an excited utterance. We agree with the State.

Mr. David Reed testified at trial that the Defendant called him after the shooting and while Mr. David Reed was with Mr. Dan Reed. Mr. David Reed acknowledged telling Mr. Dan Reed that he was afraid of the Defendant, but Mr. David Reed testified that he did not recall telling Mr. Dan Reed that the Defendant warned him to not tell the police anything about the shooting.

Mr. Dan Reed testified that after Mr. David Reed spoke to the police, they returned to Mr. Dan Reed's house and were on the front porch when Mr. David Reed received a telephone call. Mr. Dan Reed stated that when Mr. David Reed answered the call, he had a "s**t look on his face." Mr. Dan Reed clarified that Mr. David Reed

seemed fearful, upset, and "shaky" and that "[t]he look on his face was just like he saw a ghost." Mr. Dan Reed asked Mr. David Reed who was calling, and Mr. David Reed replied, "Dolla," or the Defendant. At some point, Mr. Dan Reed took the telephone from Mr. David Reed and argued with the Defendant. Mr. Dan Reed stated that following the telephone call, Mr. David Reed still appeared frightened and told Mr. Dan Reed that the Defendant had told him not to tell the police what happened.

During a bench conference, defense counsel objected and argued that Mr. Dan Reed's testimony called for double hearsay. Defense counsel acknowledged that the Defendant's statements to Mr. David Reed would fall within a hearsay exception but argued that Mr. David Reed's statements to Mr. Dan Reed did not. The State responded that the Defendant's statements to Mr. David Reed were party opponent admissions and that Mr. David Reed's statements to Mr. Dan Reed fell within the excited utterance hearsay exception. The State argued that Mr. David Reed was under the stress or excitement of the telephone call that he received from the Defendant and that Mr. David Reed's statements related to the substance of the call.

The trial court found that Mr. David Reed, who was subject to a material witness warrant, was a reluctant witness and that he was more forthcoming to the police than he was on the witness stand. The trial court noted that Mr. David Reed made the statements within twenty-four hours of the shooting, after which he appeared at Mr. Cotton's house crying. The trial court stated that Mr. David Reed was "somewhat emotional about the whole episode." The trial court noted that when Mr. David Reed received the telephone call, he became fearful and shaky as if he had seen a ghost. The trial court determined that Mr. David Reed's statements fell within the excited utterance hearsay exception.

Following the bench conference, Mr. Dan Reed testified that Mr. David Reed informed him that the Defendant asked what the police were saying and told Mr. David Reed that he should not provide any information to the police.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. A trial court's findings of fact or credibility determinations underlying a decision to admit or exclude hearsay are binding on an appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). The appellate court reviews de novo the determination of whether the statement is hearsay or whether it is subject to an exception to the rule against hearsay. *Id.* We review for abuse of discretion the determination to exclude otherwise admissible hearsay based on relevance or on a balancing of probative value and prejudice under Tennessee Rule of Evidence 403. *Id.*

An exception to the rule prohibiting hearsay that is included in the Tennessee Rules of Evidence is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). In order for the exception to apply "(1) there must be a startling event or condition that causes the stress of excitement; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant was under the stress of excitement." *State v. Land*, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). The rationale behind the exception is that (1) because the statement is made spontaneously in response to a startling event, there is little opportunity for reflection or likelihood of fabrication and (2) that the statement will accurately reflect events while they are fresh in the declarant's mind. *State v. Gordon*, 952 S.W.2d 817, 819-20 (Tenn. 1997) (citing Neil P. Cohen, et. al., *Tennessee Law of Evidence* § 8.03(2).1 at 532 (3d ed. 1995)). The declarant must also have personal knowledge of the facts in the hearsay statement in order for the exception to apply. *Kendrick*, 454 S.W.3d at 479. The statement ought to be so spontaneous that it "preclude[s] the idea of deliberation and fabrication." *State v. Smith*, 857 S.W.2d 1, 9 (Tenn. 1993).

The application of the exception requires that there be a startling event or condition. "The startling event need not be the act that gave rise to the legal controversy." *Kendrick*, 454 S.W.3d at 478. "[A] subsequent startling event or condition which is related to the prior event can produce an excited utterance." *Gordon*, 952 S.W.2d at 820 (concluding that the startling event was the victim's pain from urination related to the rape); *State v. Carpenter*, 773 S.W.2d 1, 9 (Tenn. Crim. App. 1989) (holding that the startling even was the defendant's return to the scene). "[S]tatements made in response to questions may still be admissible if the declarant is under the excitement or stress of the event." *Gordon*, 952 S.W.2d at 820-21. The startling even should be such that it "'suspend[s] the normal, reflective thought processes of the declarant.'" *State v. Franklin*, 308 S.W.3d 799, 823 (Tenn. 2010) (quoting *State v. Stout*, 46 S.W.3d 689, 699 (Tenn. 2001), *superseded by statute as stated in State v. Odom*, 137 S.W.3d 572, 581 (Tenn. 2004)).

Next, the statement must relate to the event. "A statement relates to the startling even when it describes all or part of the event or condition, or deals with the effect or impact of that event or condition." *Kendrick*, 454 S.W.3d at 478.

Finally, the statement must be made under the stress or excitement from the event or condition. Our supreme court has recognized that

> [t]he "ultimate test" under this prong is whether the statement suggests "spontaneity" and whether the statement has a "logical relation" to the shocking event. When "an act or declaration springs out of the transaction

while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication," this prong may be satisfied.

*Id*. (quoting *Gordon*, 952 S.W.2d at 820). In determining if the declarant is under the stress or excitement of the startling event, the court may consider the interval between the event and the statement, the nature and seriousness of the events, and the appearance, behavior, outlook, and circumstances of the declarant. *See State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993). The declarant's circumstances include age and physical or mental condition. *Kendrick*, 454 S.W.3d at 478. "[T]he 'length of time between a startling event and the statement does not automatically preclude the statement's being admissible as an excited utterance.'" *State v. Banks*, 271 S.W.3d 90, 116-17 (Tenn. 2008) (quoting *Rickey Williams v. State*, No. W2006-00605-CCA-R3-PC, 2007 WL 2120174, at *7 (Tenn. Crim. App. July 24, 2007)). The contents of the statement, which might indicate the degree of the declarant's stress, can also be considered. *Kendrick*, 454 S.W.3d at 478. The court may also consider whether the statement is made in response to an inquiry or whether it is self-serving. *Id.* at 479. "[W]hen a statement is made in response to an inquiry or when the statement is self-serving, these factors may show the statement was the result of reflective thought." *Id.*

The Defendant argues that none of the three requirements for the application of the excited utterance hearsay exception have been met. The Defendant notes that Mr. David Reed testified at trial and he did not recall making the statement to Mr. Dan Reed. However, the trial court found that Mr. David Reed was a reluctant witness whose presence at trial had to be secured through a material witness warrant and that Mr. David Reed was not forthcoming in his testimony at trial. Rather, Mr. Dan Reed testified that when the Defendant called, Mr. David Reed became frightened, was shaking, and appeared as if he had seen a ghost. We conclude that the Defendant's calling Mr. David Reed less than twenty-four hours after the Defendant was alleged to have shot Mr. David Reed's friends, killing two of them, was a startling event that caused the stress of excitement. Mr. David Reed's statement to Mr. Dan Reed related to the telephone call. Mr. David Reed made the statement shortly after the call while he was still frightened. Mr. David Reed was still laboring under the excitement from the telephone call and made the statement at a time so near to the call as to preclude "'the idea of deliberation and fabrication.'" *Kendrick*, 454 S.W.3d at 478 (quoting *Gordon*, 952 S.W.2d at 820). We, therefore, conclude that the trial court properly found that Mr. David Reed's statement was admissible as an excited utterance.

## V. Evidence of the Defendant's Placement on the TBI's Most Wanted List

The Defendant asserts that the trial court erred in admitting evidence that he was placed on the TBI's Most Wanted List. He maintains that the evidence was irrelevant and unfairly prejudicial. The State responds that the trial court did not abuse its discretion in admitting the evidence because the evidence was relevant to the Defendant's conscious and prolonged flight and its probative value was not substantially outweighed by the danger of unfair prejudice. We agree with the State.

Prior to trial, the Defendant filed a motion in limine seeking to exclude any evidence of his placement on the TBI's Top Ten Most Wanted List. The Defendant argued that the evidence was irrelevant and unfairly prejudicial. The State argued at trial that the evidence was relevant to the Defendant's flight and consciousness of guilt. The State noted the steps that the police took in an effort to locate the Defendant and stated that on September 6, 2016, when the police were unable to apprehend the Defendant, they placed him on the TBI's Most Wanted List, that the Defendant's photograph was shown to other law enforcement agencies throughout the state and the country, that a reward was set, and that the Defendant turned himself in to the police on the following morning. The State argued that placement on the list does not mean that a perpetrator is guilty but only that the perpetrator has been charged with an offense.

The trial court noted that while the State had argued flight, the defense had argued that the Defendant had turned himself in to the police voluntarily. The trial court found that in light of the Defendant's argument, the degree to which there was information in the community about the Defendant's charges was relevant and probative. The trial court also found that the evidence was relevant as to the steps that officers had taken to attempt to locate the Defendant. The trial court found that while the Defendant was "cloaked in this stigma of being accused at this particular point," the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403. The admissibility of evidence is within the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *See Pylant v. State*, 263 S.W.3d 854, 870 (Tenn. 2008).

At trial, the State presented evidence of law enforcement's efforts to locate and apprehend the Defendant, while the defense argued that the Defendant voluntarily turned himself in to the police. Evidence that the Defendant turned himself in to the police a short time after he was placed on the TBI's Most Wanted List, information about the Defendant the charges was disseminated, and a reward for information leading to his arrest was offered was relevant to the issue of flight and to rebut the defense's claim that the Defendant turned himself in to the police upon his own volition. The evidence is especially probative in light of proof of the Defendant's efforts to elude capture prior to his placement on the list. While the evidence was somewhat prejudicial, the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice. We conclude that the trial court properly exercised its discretion in admitting the evidence.

## CONCLUSION

We remand the case to the trial court for a hearing regarding whether the State struck a potential juror in violation of *Batson*. At the hearing, the Defendant should be given the opportunity to proceed with his efforts to establish a violation. The trial court shall make specific findings, applying the principles set forth in this opinion. If the trial court concludes that the Defendant has met his burden of establishing a *Batson* violation, the trial court shall grant the Defendant a new trial. If the trial court concludes that the State's exercise of the peremptory challenge did not violate *Batson*, the Defendant shall have the right to appeal the trial court's decision. We conclude that the Defendant is not entitled to relief with regard to his remaining claims.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 43 -